IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JENNIFER SCHIERMEYER, Individually and as Special Administrator of the ESTATE OF MATTHEW T. SCHIERMEYER, Deceased, | ) ) ) ) | Case No. _____ |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| POLARIS INDUSTRIES INC.; POLARIS SALES INC.; POLARIS INC.; and INDIANA MILLS AND MANUFACTURING, INC., d/b/a IMMI, | ) ) ) ) | |
| Defendants. | | |

COMES NOW Plaintiff, Jennifer Schiermeyer, individually, and as Special Administrator of the Estate of Matthew T. Schiermeyer, deceased, by and through her counsel, and for her Complaint against Defendants, Polaris Industries Inc., Polaris Sales Inc., Polaris Inc., and Indiana Mills and Manufacturing, Inc., d/b/a IMMI, states and alleges as follows:

## **PARTIES**

1.      Plaintiff, Jennifer Schiermeyer ("Ms. Schiermeyer"), is a citizen of and domiciled in the State of Nebraska and is a resident of Fairfield, Clay County, Nebraska. Ms. Schiermeyer is the Special Administrator of the Estate of Matthew T. Schiermeyer ("Mr. Schiermeyer"), deceased. At all times material herein, Ms. Schiermeyer was the spouse of Mr. Schiermeyer and brings her own claims individually.

2.      Defendant, Polaris Industries Inc. ("Polaris Industries"), is a Delaware corporation, with its principal place of business and operations located in Medina, Minnesota.

3.      Defendant, Polaris Sales Inc. ("Polaris Sales"), is a Minnesota corporation, with its principal place of business and operations located in Medina, Minnesota.

4.      Defendant, Polaris Inc. ("Polaris Inc."), is a Minnesota corporation, with its principal place of business and operations located in Medina, Minnesota.

5.      Defendant Indiana Mills and Manufacturing, Inc., d/b/a IMMI ("IMMI") is an Indiana corporation with its principal place of business and operations located in Westfield, Indiana.

6.      Polaris Industries, Polaris Sales, and Polaris Inc. are hereafter collectively referred to as "Polaris." Polaris and IMMI are hereafter collectively referred to as "Defendants."

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over the above-captioned lawsuit pursuant to Neb. Rev. Stat. § 24-302 because there is an actual and justiciable controversy between the parties to this lawsuit.

8.      This Court has personal jurisdiction over Defendants pursuant to Neb. Rev. Stat. § 25-536 because they have transacted business and/or supplied services or goods in Nebraska. In addition, personal jurisdiction over Defendants complies with the Constitutions of Nebraska and the United States.

9.      Venue is proper in Nebraska, pursuant to Neb. Rev. Stat. § 25-403.01 because a substantial part of the events that give rise to the above-captioned lawsuit took place in Clay County, Nebraska.

## BACKGROUND

10.     On or about September 15, 2023, Mr. Schiermeyer was operating a 2021 Polaris Ranger Crew XP 1000 (serial number/VIN 4XARSE991M8444938) (hereafter, "Ranger") on County Road 302 near the intersection of County Road H near Deweese, in Clay County, Nebraska, when the Ranger was involved in an incident.

11.     Prior to operating the Ranger that day, Mr. Schiermeyer inserted the soft mesh "doors/cab nets" which are standard equipment on the 2021 Polaris Ranger Crew XP 1000. The doors/cab nets were made of cloth and mesh material, and were secured using a plastic clip buckle, also called a "side-release" or "quick-release" buckle.

12.     As Mr. Schiermeyer was driving the Ranger at a reasonable and foreseeable speed on County Road 302, he approached a curve on the otherwise flat but unpaved road, and the Ranger started to slide sideways and flipped.

13.     The Ranger rolled and Mr. Schiermeyer was ejected from the Ranger. Mr. Schiermeyer was ejected from the driver's side, and the Ranger rolled on top of him, ultimately pinning and trapping him underneath the Ranger.

14.     After the rollover crash, Mr. Schiermeyer's son, Dillon, found Mr. Schiermeyer laying underneath the Polaris, which was pinned on top of his neck.

15.     The crash caused Mr. Schiermeyer to suffer severe personal injuries, damages, and ultimately his death.

16.     At the time of the incident, Mr. Schiermeyer was operating and using the Ranger in a way and for the general purpose for which it was designed and intended and/or in a way that Defendants and their employees, agents, and/or joint venturers did anticipate or foresee and/or could have reasonably anticipated or foreseen.

17.     At the time of the incident, Mr. Schiermeyer was operating the Ranger in a reasonable and appropriate manner. Mr. Schiermeyer did not cause his injuries or death.

18.     Defendants at all relevant times herein sold vehicles to members of the general public as well as designing, testing, manufacturing, inspecting, distributing, recalling them, and warning and instructing users on the safe use of the Polaris' Rangers, including the subject Ranger, in exchange for valuable consideration throughout the United States, including Clay County, Nebraska.

**A. The Vehicle Defects.**

19.     The Ranger slid sideways and ultimately rolled due to defects with, among other things, the Ranger's deficient lateral stability, its deficient vehicle handling and steering, its deficient rollover resistance, its deficient tires, its deficient seatbelt restraint system, its deficient door/cab net locking or latching mechanism, its deficient structure of the door and/or netting/mesh lining on the doors, its deficient door frame and hinges, and its lack of a proper stability and/or traction control  and/or rollover protection control system (collectively, "Vehicle Defects").

20.     Defendants knew about the Vehicle Defects and/or should have reasonably foreseen and anticipated them before designing, manufacturing, selling, and distributing the Ranger, including before Mr. Schiermeyer's September 2023 crash.

21.     Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew about these Vehicle Defects, should have known about them, and/or should have reasonably foreseen and anticipated them before Mr. Schiermeyer's September 2023 crash.

22.     Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew, should have known, and/or reasonably foreseen anticipated

that these Vehicle Defects were unreasonably dangerous and were likely to cause injuries and death to drivers and occupants in the Ranger (including Mr. Schiermeyer).

23.     The incident, Mr. Schiermeyer's ejection from the Ranger, and his damages, injuries, and death were a result of the Vehicle Defects with the Ranger.

24.     The Vehicle Defects made the Ranger more prone to improperly sliding, sliding sideways, and to rolling over (including by way of un-tripped rollovers and tripped rollovers[1]) during turns, steering, and navigating curves similar to the curve on which Mr. Schiermeyer was driving at the time of his incident. Defendants knew and/or could have reasonably foreseen and anticipated that this would make the Ranger unreasonably dangerous and unsafe for its intended use.

25.     The Vehicle Defects made the Ranger more prone to ejections from the vehicle and crushing by the vehicle during rollovers due to defects in the door/cab net structure or netting/mesh lining, the door/cab net latching mechanisms, the door frame or hingers, and the seatbelt restraint system. Defendants knew and/or could have reasonably foreseen and anticipated that this would make the Ranger unreasonably dangerous and unsafe for its intended use.

26.     The Vehicle Defects made the Ranger more prone to improperly sliding, sliding sideways, and to rolling over during turns, steering, and navigating curves at speeds (including at speeds above 15 miles per hour) that normally would not cause such sliding, sliding sideways, and rolling. Defendants knew and/or could have reasonably foreseen and anticipated that this would make the Ranger unreasonably dangerous and unsafe for its intended use.

27.     The Vehicle Defects dangerously made the Ranger more prone to improperly sliding, sliding sideways, and to rolling over during turns, steering, and navigating curves at the reasonable and appropriate speed that Mr. Schiermeyer was operating the Ranger at the time of the incident. Such turns, steers, and navigating curves at the speed at which Mr. Schiermeyer was operating the Ranger at the time of the incident would not normally cause, nor would an ordinary consumer expect them to cause, such sliding, sliding sideways, and rolling in a properly designed and manufactured utility terrain vehicle. Defendants knew and/or could have reasonably foreseen

---

[1] A "tripped rollover" occurs when, for example, a utility terrain vehicle, such as the Polaris, is sliding sideways and hits or makes contact with an object (like, for example, a curb, rut in the roadway, or something off the side of a road), which causes the vehicle to roll.

and anticipated that this would make the Ranger unreasonably dangerous and unsafe for its intended use.

28.    Before designing, manufacturing, selling, and distributing the Ranger, Defendants knew about and were aware that the Vehicle Defects had resulted in many uncontrolled slides, rollover incidents, and driver/occupant ejections or crushings (including deaths caused by such slides, rollover incidents, and ejections) involving the Ranger and other Polaris Rangers that used the same or similar design as the Ranger.

29.    The Ranger is a utility terrain vehicle ("UTV"). Among other things, Defendants intended the Ranger to be, and reasonably foresaw and anticipated it to be, a vehicle that ordinary consumers like Mr. Schiermeyer would use for, among other things, recreation, enjoyment, work, offroad use, on-road use, driving, driving and transporting people and cargo from one destination to another, doing tasks, and any other number of activities and tasks that ordinary users and the public do in UTVs.

30.    UTVs with lower lateral stability are more likely to slide sideways and roll during steering maneuvers, turns, and navigating curves than those with higher lateral stability. This is because more lateral force is required to cause sliding sideways and rolling in UTVs with higher lateral stability.

31.    In simple terms, the narrower the UTVs' track width and the greater the UTV's height, the more likely the UTV will have lower lateral stability. And, again, lower lateral stability increases the likelihood of a UTV sliding and rolling, including during turns and traveling on curves in roads.

32.    The Ranger had an unreasonably dangerous low lateral stability. It had a narrow track width (*i.e.*, the distance between its wheels), which, combined with its height, made it susceptible to sliding sideways and rolling over. Defendants knew and/or should have known about this danger and risk before and/or while designing, manufacturing, selling, and distributing the Ranger on the market; yet, they failed to adequately and properly design and manufacture the Ranger to prevent it from sliding sideways and rolling over during expected and reasonably foreseeable operation of the Ranger, including, but not limited to, the way in which Mr. Schiermeyer was operating and steering the Ranger on September 15, 2023. Defendants knew and/or could have reasonably foreseen and anticipated that this would make the Ranger unreasonably dangerous and unsafe for its intended use.

33.     Stability control and traction control systems help prevent and/or mitigate UTVs from sliding sideways, spinning, and rolling. For example, if a UTV begins to slide sideways while a driver is turning, oversteering, or navigating a curve, then stability and traction control systems can detect that and can, among other things, automatically apply braking and/or adjust throttle or engine control to prevent and/or stop the sliding and help the driver maintain control of the UTV and prevent a rollover.

34.     Polaris and/or IMMI, however, failed to design, manufacture, sell, and distribute the Ranger with an appropriate stability and/or traction control system to prevent and/or mitigate the Ranger from sliding sideways and rolling. As a result, at the time of Mr. Schiermeyer's incident, the Ranger went into, and continued in, a slide, slid sideways, and the Ranger ultimately rolled, causing severe injuries, damages, and death to Mr. Schiermeyer.

35.     Defendants knew and/or could have reasonably foreseen and anticipated that the failure to design, manufacture, sell, and distribute the Ranger with an appropriate stability and/or traction control system would make the Ranger unreasonably dangerous and unsafe for its intended use.

36.     An ordinary consumer and user (including Mr. Schiermeyer) of the Ranger could not, and would not, reasonably anticipate or contemplate the unreasonably dangerous nature of the Ranger (including, but not limited to, its deficient lateral stability, its deficient vehicle handling and steering, its deficient rollover resistance, its lack of a proper stability and/or traction control system and the lack of a proper latching system for its doors and cab nets) or fully appreciate the unreasonable risk of severe injuries and death associated with using the Ranger.

37.     The average consumer and user does not inspect a UTV (including the Ranger) for design, manufacturing, and warning defects, including latent defects. Instead, consumers and users (including Mr. Schiermeyer) of the Ranger reasonably expect and anticipate the Ranger will be safe for operation, will operate in a safe and expected way on roads, and will not uncontrollably and continue to slide sideways or roll during turns and navigating curves similar to the way in which Mr. Schiermeyer was driving the Ranger at the time of his incident.

38.     Due to the Vehicle Defects, the Ranger was unreasonably dangerous to an extent beyond that which would be contemplated by an ordinary consumer or user (including Mr. Schiermeyer) of the Ranger. The Vehicle Defects were not common knowledge to the public or to Mr. Schiermeyer.

39.     Due to the Vehicle Defects, the Ranger presented a greater risk of injury and death than an ordinary consumer or user (including Mr. Schiermeyer) of the Ranger would expect when using the Ranger or that type of product.

40.     An ordinary consumer and user of the Ranger (including Mr. Schiermeyer) would not anticipate or expect that the Ranger would uncontrollably and continue to slide sideways or roll – and cause serious injuries or death – due to the way that Mr. Schiermeyer was driving and steering the Ranger and navigating the curve on the flat road at the time of incident on September 15, 2023. Properly designed, engineered, and manufactured UTVs do not uncontrollably and continue to slide sideways or roll due to the manner in which Mr. Schiermeyer was driving and steering the Ranger at the time of the incident.

### B.  The Seatbelt Defects.

41.     The Ranger had an occupant restraint system that included seatbelts and a driver seatbelt interlock device/system.

42.     Polaris and/or IMMI designed, engineered, manufactured, distributed, sold, and marketed the occupant restraint system, including the seatbelts and driver seatbelt interlock device/system, in the Ranger.

43.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants knew that users of the Ranger were unlikely to wear seatbelts or helmets while driving or riding in the Ranger. Defendants knew that for a variety of reasons (including, but not limited to, users frequently getting in and out of Polaris Rangers for various tasks and not appreciating the risks and dangers of the Ranger), consumers and users of the Ranger would be less likely to wear seatbelts or helmets while using the Ranger.

44.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants also knew that the driver's use of the Ranger's seatbelt was important for the safety of the driver because, among other things, the Ranger was not designed or manufactured with several safety features that are common in cars (such as airbags and side curtain airbags) that are designed to prevent injuries and to help keep occupants in a vehicle in the event of a crash or a rollover.

45.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants knew that the driver and occupants in the Ranger were more likely to survive a crash, sliding, or a rollover if they remained in the Ranger rather than being ejected.

46.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants knew that sliding, sliding sideways, crashes, and rollover incidents were likely to cause drivers and occupants in the Ranger to be either partially or fully ejected from it.

47.     Defendants, in fact, knew this risk and danger was so great that they designed the Ranger so that it could not be driven above 15 miles per hour unless a seatbelt latch plate was latched into the driver's seatbelt buckle. This is known as a "seatbelt interlock" system/device.

48.     Defendants knew that driving the Ranger above 15 mph without the driver wearing his or her seatbelt significantly increased the danger of injuries, death, and driver/occupant ejection if the Ranger was involved in a crash, including a sliding or rollover incident.

49.     At the time of the crash, the Ranger had three seats in one row for occupants to sit. There was a driver's seat, a middle passenger seat, and a passenger seat next to the middle seat.

50.     Each of the three seats had separate seatbelts for each seat. The three seatbelts each consisted of a shoulder strap/belt and a seatbelt buckle. The design and manufacture of the three seatbelts in the Ranger were the same, including the shoulder straps/belts and buckles and the latch plates. A latch plate is the metal component on a seatbelt strap that snaps into the buckle.

51.     Each of the latch plates on the three seatbelts could be latched into any of the three buckles. The latch plates and buckles were not different such that they could only be buckled into the seat where they were located.

52.     Because the three seatbelts were not different, users of the Ranger could take any passenger seatbelt/strap and latch plate and latch it into the driver's seatbelt buckle. By doing that, a driver of the Ranger could drive the Ranger above 15 miles per hour without wearing a seatbelt.

53.     Furthermore, users of the Ranger could also latch the driver's seatbelt latch plate into the buckle before sitting in the driver's seat and operating the Ranger. The driver would then sit on the lap belt, rather than wearing it on top of them. By doing that, a driver of the Ranger could drive the Ranger above 15 miles per hour without wearing a seatbelt.

54.     Before Mr. Schiermeyer's incident, it was simple and easy to latch the driver's seatbelt's latch plate into the driver's buckle in the Ranger, leave it there permanently, and start driving the Ranger without wearing a seatbelt.

55.     In fact, a driver or user of the Ranger like Mr. Schiermeyer could get into the Ranger and not even notice the seatbelt was buckled into the driver's buckle. The driver's seatbelt strap

could be laid flat against the driver's seatback and latched into the driver's seatbelt buckle without interfering with someone driving the Ranger or sitting anywhere in the Ranger.

56.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew and/or should have anticipated or foreseen that users of the Ranger could or would latch the driver's seatbelt's latch plate (or the other passenger seatbelt's latch plate) into the driver's seatbelt buckle in the Ranger and drive the Ranger without wearing a seatbelt, and at speeds greater than 15 mph.

57.    At the time of Mr. Schiermeyer's crash on September 15, 2023, the driver's seatbelt on the Ranger was latched into the driver's seatbelt buckle, and Mr. Schiermeyer operated the vehicle while sitting on top of while it was latched in. This allowed Mr. Schiermeyer to drive the Ranger above 15 miles per hour without wearing a seatbelt.

58.    When Mr. Schiermeyer got into the Ranger shortly before the crash, the driver's seatbelt on the Ranger was already latched into the driver's seatbelt buckle. Mr. Schiermeyer did not latch the driver's seatbelt into the driver's seatbelt buckle before the crash.

59.    At the time of the crash, Mr. Schiermeyer was not wearing a seatbelt.

60.    At the time of the crash, Mr. Schiermeyer was operating the Ranger at a speed greater than 15 miles per hour, but not at a speed that was improper or unreasonable under the circumstances or that was unforeseeable to Defendants.

61.    The speed at which Mr. Schiermeyer was operating the Ranger at the time of the crash was reasonable and appropriate. Further, Defendants knew and could have reasonably foreseen that drivers like Mr. Schiermeyer would drive the Ranger at the speed at which he was operating the Ranger when the crash occurred.

62.    Mr. Schiermeyer was not violating any speed limits at the time of the crash. The posted speed limit on the road at the time of the crash was 50 miles per hour. Speed was not noted to be factor in Mr. Schiermeyer's accident.

63.    Because the driver's seatbelt was latched into the driver's seatbelt buckle, Mr. Schiermeyer was able to operate the Ranger at a speed of more than 15 miles per hour without wearing a seatbelt at the time of the crash.

64.    The occupant restraint system, including the seatbelts and the seatbelt interlock device/system, in the Ranger were defective because, among other things, (a) the driver's seatbelt buckle could be engaged with the latch plates from any of the seatbelts in the vehicle, (b) latching

any seatbelt's latch plate into the driver's buckle allowed drivers of the Ranger like Mr. Schiermeyer to operate the Ranger without wearing a seatbelt and allowed such drivers to operate the Ranger at speeds above 15 miles per hour that were dangerous and which could result in rollovers or ejections, (c) the Ranger did not have appropriate safety mechanists or features (such as different latch plates or buckles) to prevent users from bypassing or incorrectly using the seatbelt interlock system/device or to prevent users from latching the middle seatbelt or the other passenger's seatbelt into the driver's buckle, (d) the Ranger did not have appropriate safety mechanisms or features to prevent users of the Ranger from driving the Ranger without a seatbelt, and (e) the Ranger did not include any warnings (such as auditory sounds or warnings) to notify occupants and the driver of the Ranger that the seatbelt interlock system/device had been bypassed or used incorrectly (collectively, "Seatbelt Defects").

65.     Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew about these Seatbelt Defects, should have known about them, and/or should have reasonably foreseen and anticipated them before Mr. Schiermeyer's September 2023 crash.

66.     Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew, should have known, and/or reasonably foreseen anticipated that these Seatbelt Defects were unreasonably dangerous and were likely to cause injuries and death to drivers and occupants in the Ranger (including Mr. Schiermeyer).

67.     As a result of the Seatbelt Defects, Mr. Schiermeyer was not wearing his seatbelt at time of the crash and was ejected from the Ranger, resulting in him suffering personal injuries and death.

68.     But for the Seatbelt Defects, Mr. Schiermeyer would have been wearing his seatbelt at the time of the crash and would not have been ejected from the Ranger, causing his personal injuries and death.

69.     But for the Seatbelt Defects, Mr. Schiermeyer would not have been able to operate the Ranger at a speed greater than 15 miles per hour, and the sliding, roll, and crash incident involving the Ranger would not have occurred.

70.     The incident, Mr. Schiermeyer's ejection from the Ranger, and his damages, injuries, and death were a result of the Seatbelt Defects with the Ranger.

71.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew and/or should have reasonably foreseen and anticipated that users and drivers of the Ranger would take the driver's seat shoulder belt/strap and latch plate and latch it into the driver's seatbelt buckle, and subsequently sit on it in order to operate the vehicle over 15 miles per hour without having to use a seatbelt.

72.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew and/or should have reasonably foreseen and anticipated that latching the driver's latch plate into the driver's buckle without actually wearing it allowed drivers of the Ranger like Mr. Schiermeyer to operate the Ranger without wearing a seatbelt and allowed such drivers to operate the Ranger at speeds above 15 miles per hour that were unreasonably dangerous, including, but not limited to, in light of the Vehicle Defects and the Seatbelt Defects. Further, Defendants knew and/or could have reasonably foreseen and anticipated that this would make the Ranger unreasonably dangerous and unsafe for its intended use.

73.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew and/or should have reasonably foreseen and anticipated that the seatbelt interlock system/device could be bypassed or used incorrectly such that users of the Ranger could operate the Ranger at speeds greater than 15 mph without wearing a seatbelt. Further, Defendants knew that bypassing or incorrectly using the seatbelt interlock system/device could and would make the Ranger unreasonably dangerous and unsafe for its intended use.

74.    An ordinary consumer and user (including Mr. Schiermeyer) of the Ranger could not, and would not, reasonably anticipate or contemplate the unreasonably dangerous nature of the Ranger or fully appreciate the risk of injuries and death associated with using the Ranger without a seatbelt.

75.    Consumers and users (including Mr. Schiermeyer) of the Ranger reasonably expect and anticipate the Ranger will be safe for operation, will operate in a safe and expected way on roads, and will have an occupant restraint system that will protect them in the event of a crash or rollover.

76.    An ordinary consumer and user of the Ranger (including Mr. Schiermeyer) would not anticipate or expect that the Ranger would have defects like the Seatbelt Defects.

### C. The Door/Cab Net Defects

77.     The Ranger had a door/cab net latching system that included soft mesh doors on both the driver's and passenger's side of the Ranger, including in the front and back seats. There were four doors/cab nets in total.

78.     The soft mesh doors latched into place and secured through the use of a plastic clip buckle, also called a "side-release" or "quick-release" buckle. On the opposite side, the soft mesh doors were permanently attached to the Ranger through the use of bolts.

79.     Defendants designed, engineered, manufactured, distributed, sold, and marketed the soft mesh doors on the Ranger, including the plastic quick release buckle on the doors.

80.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants knew that users of the Ranger were likely to use the doors/cab nets on the Ranger while operating it. Defendants furthermore knew or should have known that users of the Ranger would use the doors/cab nets with the assumption that the doors/cab nets would keep them inside the vehicle should an accident or rollover occur.

81.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants knew that the driver and occupants in the Ranger were more likely to survive a crash, sliding, or a rollover if they remained in the Ranger rather than being ejected.

82.     Before the design, manufacture, sale, and distribution of the Ranger, Defendants knew that sliding, sliding sideways, crashes, and rollover incidents were likely to cause drivers and occupants in the Ranger to be either partially or fully ejected from it.

83.     Because of this, Defendants warned users of the Ranger to only operate the Ranger with the use of the doors/cab nets.

84.     At the time of the crash, Mr. Schiermeyer was using the Ranger with the doors/cab nets latched in with the plastic quick release buckle, as recommended by the Defendants. However, when the accident occurred, the plastic quick release buckle on the doors/cab nets failed and snapped in half, resulting in the ejection of Mr. Schiermeyer from the Ranger.

85.     The door/cab nets latching mechanism and door/cab nets system were defective because, among other things, (a) the soft mesh doors were not designed in a way to keep occupants inside the vehicle in the event of a rollover, nor were they designed to withhold the weight of someone who was going to be ejected from the vehicle, despite being sold and marketed as "doors;" (b) the plastic quick release buckle was not designed to withstand the weight of a person

who fell into the door/cab net, and would break under pressure, making the purpose of the doors/cab nets completely moot; and (c) the Ranger did not have appropriate safety mechanisms or features  (such as plastic or metal doors or a metal striker and latch, similar to a car door) to keep occupants inside the vehicle in the event of a crash or rollover (collectively, "Door Defects").

86.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew, should have known, and/or reasonably foreseen anticipated that these Door Defects were unreasonably dangerous and were likely to cause injuries and death to drivers and occupants in the Ranger (including Mr. Schiermeyer).

87.    But for the Door Defects, Mr. Schiermeyer would not have been ejected from the Ranger during the rollover, causing his personal injuries and death.

88.    Mr. Schiermeyer's accident, including his damages, injuries, and death, were a result of the Door Defects with the Ranger.

89.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew and/or should have reasonably foreseen and anticipated that users and drivers of the Ranger would use the doors/cab nets as instructed by the warning labels and owner's manual and that users would expect these doors/cab nets to protect them in the event of a crash or rollover.

90.    Before the design, manufacture, sale, and distribution of the Ranger (including before the crash), Defendants knew and/or should have reasonably foreseen and anticipated that the door/cab net latching system and plastic quick release buckle would fail in the event of a rollover, which could and would make the Ranger unreasonably dangerous and unsafe for its intended use.

91.    An ordinary consumer and user (including Mr. Schiermeyer) of the Ranger could not, and would not, reasonably anticipate or contemplate the unreasonably dangerous nature of the Ranger or fully appreciate the risk of injuries and death associated with using the Ranger with its aforementioned Door Defects.

92.    Consumers and users (including Mr. Schiermeyer) of the Ranger reasonably expect and anticipate the Ranger will be safe for operation, will operate in a safe and expected way on roads, and will have a door/cab net system that will protect them in the event of a crash or rollover.

93.    Due to the Door Defects, the Ranger was unreasonably dangerous to an extent beyond that which would be contemplated by an ordinary consumer or user (including Mr.

Schiermeyer) of the Ranger. The Door Defects were not common knowledge to the public or to Mr. Schiermeyer.

94.    Due to the Door Defects, the Ranger presented a greater risk of injury and death than an ordinary consumer or user (including Mr. Schiermeyer) of the Ranger would expect when using the Ranger or that type of product.

**D. The Ranger and Polaris Ranger Crew XP 1000**

95.    Before and after September 2023, Polaris manufactured, distributed, sold, and marketed thousands of Polaris Ranger Crew XP 1000 vehicles throughout the United States, including, but not limited to, in Nebraska.

96.    Before and after September 2023, Polaris manufactured, distributed, sold, and marketed thousands of occupant restraint systems and a door/cab net latching mechanism and door/cab net system (including seatbelts and soft mesh doors, including plastic quick release clips) for use in the Polaris Ranger Crew XP 1000 vehicles throughout the United States, including, but not limited to, in Nebraska.

97.    At all times material herein, Polaris Industries, Polaris Sales, Polaris Inc., and IMMI, and each of them, were involved in, and had control over, the design, engineering, manufacturing, distribution, sale, and marketing of the Ranger and the Polaris Ranger Crew XP 1000 vehicles.

98.    At all times material herein, Polaris Industries, Polaris Sales, Polaris Inc., and/or IMMI, and each of them, were involved in, and had control over, the design, engineering, manufacturing, distribution, sale, and marketing of the Polaris Ranger Crew XP 1000 vehicles and the Ranger, including, but not limited to, its stability, traction, vehicle handling and steering, rollover resistance, occupant restraint system, seatbelts, driver seatbelt interlock device/system, door/cab net latching mechanism, and door/cab net system.

99.    At all times material herein, Polaris Industries, Polaris Sales, Polaris Inc., and IMMI, and each of them, were involved in and had control over the ownership, operation, management, and control of each other's businesses, including, but not limited to, their business in designing, engineering, manufacturing, distributing, selling, and marketing the Ranger and the Polaris Ranger Crew XP 1000 vehicles.

100.     At all times material herein, Polaris Industries, Polaris Sales, Polaris Inc. and IMMI were engaged in a joint venture, employment, and/or agency relationship with regard to the designing, engineering, manufacturing, distributing, selling, and marketing of the Ranger and the Polaris Ranger Crew XP 1000 vehicles. The actions and/or inactions of Polaris Industries, Polaris Sales, Polaris Inc. and IMMI, and each of them, and their employees, agents, and/or joint venturers, which are described in this lawsuit, were committed in the course and scope of their joint venture, employment, and/or agency relationship.

101.     At all times material herein, Polaris Industries, Polaris Sales, Polaris Inc., and/or IMMI, were engaged in a joint venture, employment, and/or agency relationship with regard to the designing, engineering, manufacturing, distributing, selling, and marketing of the Polaris Ranger Crew XP 1000 vehicles and the Ranger (including, but not limited to, its stability, traction, vehicle handling and steering, rollover resistance, occupant restraint system, seatbelts, and driver seatbelt interlock device/system). The actions and/or inactions of Polaris Industries, Polaris Sales, Polaris Inc., and/or IMMI, and their employees, agents, and/or joint venturers, which are described in this lawsuit, were committed in the course and scope of their joint venture, employment, and/or agency relationship.

## FIRST CAUSE OF ACTION:
## WRONGFUL DEATH CLAIM

102.     Plaintiff hereby reincorporates Paragraphs 1 through 101 of her Complaint as if fully set forth again.

103.     Plaintiff's first cause of action against Defendants is a wrongful death claim against Defendants.

104.     With regard to Plaintiff's wrongful death claim against Defendants, Plaintiff hereby asserts and incorporates herein the following four counts/claims/legal theories against Defendants.

105.     The damages Plaintiff seeks against Defendants on Plaintiff's wrongful death claim are identified in 142(a) through (c) and 143 of her Complaint and are incorporated herein by this reference.

## COUNT ONE:
## STRICT LIABILITY DESIGN DEFECT CLAIM
## AGAINST DEFENDANTS

106.     Plaintiff hereby reincorporates Paragraphs 1 through 105 of her Complaint as if fully set forth again.

107.   Defendants placed the Ranger on the market for use and knew, or in the exercise of reasonable care should have known, that the Ranger would be used by consumers (including Mr. Schiermeyer) without inspecting the Ranger for defects.

108.   Before his September 2023 crash and subsequent death, Mr. Schiermeyer did not know about the Vehicle Defects, Seatbelt Defects, or Door Defects and did not know those defects made the Ranger dangerous and likely to cause injuries or death to him.

109.   Defendants and their employees, agents, and joint venturers had a duty to, but failed to, use reasonable care to design the Ranger so that it did not have the Vehicle Defects, Seatbelt Defects, or Door Defects and so that it was not in a defective condition or unreasonably dangerous to buyers, users, and others.

110.   Due to the actions and/or inactions of Defendants and/or their employees, agents, and/or joint venturers, the Ranger was in a defective condition when Defendants placed the Ranger on the market, had the Vehicle Defects, Seatbelt Defects, and Door Defects, and was unreasonably dangerous and unsafe for its intended use when the Ranger (including its components) left the control of Defendants and/or their employees, agents, and/or joint venturers.

111.   At all material times, Mr. Schiermeyer was using the Ranger as intended and/or in a way that Defendants and their employees, agents, and/or joint venturers did anticipate or foresee and/or could have reasonably anticipated or foreseen.

112.   The Vehicle Defects, Seatbelt Defects, and Door Defects of the Ranger were a proximate cause of the incident involving Mr. Schiermeyer; the injuries, damages, and death of Mr. Schiermeyer; and Plaintiff's damages and injuries.

<u>**COUNT TWO:**</u>
<u>**STRICT LIABILITY MANUFACTURING DEFECT CLAIM**</u>
<u>**AGAINST DEFENDANTS**</u>

113.   Plaintiff hereby reincorporates Paragraphs 1 through 112 of her Complaint as if fully set forth again.

114.   Due to the actions and/or inactions of Defendants and/or their employees, agents, and/or joint venturers, the Ranger (a) departed and/or differed from its intended design, specifications, and/or plan in that the Ranger and/or one or more of its component parts were defective as manufactured and/or (b) failed to properly perform in the anticipated or specified way in which Polaris and/or their employees, agents, and/or joint venturers intended the Ranger (including such parts/systems/design) to perform.

115.    Such manufacturing defects made the Ranger (including the aforementioned parts/systems/design) unreasonably dangerous and unsafe for its intended use when the Ranger (including its components) left the control of Defendants and/or their employees, agents, and/or joint venturers.

116.    The manufacturing defects in the Ranger were a proximate cause of the incident involving Mr. Schiermeyer; the injuries, damages, and death of Mr. Schiermeyer; and Plaintiff's damages and injuries.

### COUNT THREE:
### STRICT LIABILITY FAILURE TO WARN CLAIM
### AGAINST DEFENDANTS

117.    Plaintiff hereby reincorporates Paragraphs 1 through 116 of her Complaint as if fully set forth again.

118.    Defendants placed the Ranger on the market for use and knew, or in the exercise of reasonable care should have known, that the Ranger would be used by consumers (including Mr. Schiermeyer) without inspecting the Ranger for defects.

119.    Defendants had a duty to warn buyers, users, and others of the Ranger (including Mr. Schiermeyer) about the dangers of the Ranger, including the dangers with its deficient and defective stability, traction, vehicle handling and steering, rollover resistance, occupant restraint system, seatbelts, driver seatbelt interlock device/system, door/cab net latching mechanism, and door/cab net system.

120.    Defendants, however, failed to warn buyers and users of the Ranger (including Mr. Schiermeyer) about the unreasonable dangers of the Ranger, including, but not limited to, the following:

    a.    Defendants failed to properly warn that the Ranger had deficient lateral stability, deficient vehicle handling and steering, deficient rollover resistance, and a lack of a proper stability and/or traction control system;

    b.    Defendants failed to properly warn that the Ranger was prone to improperly sliding, sliding sideways, and rolling over during, among other things, turns, steering, and navigating curves under the same or similar circumstances that Mr. Schiermeyer was driving at the time of the crash;

    c.    Defendants failed to properly warn that the Ranger was prone to improperly sliding, sliding sideways, and rolling over during turns, steering, and navigating curves at speeds above 15 miles per hour;

d.  Defendants failed to properly warn that the Ranger had a dangerously low lateral stability and that UTVs with lower lateral stability were more likely to slide sideways or roll;

e.  Defendants failed to properly warn that the Ranger did not have an appropriate stability and/or traction control system to prevent and/or mitigate the Ranger from sliding sideways or rolling;

f.  Defendants failed to warn that the Ranger was not designed or manufactured with several safety features that are common in cars;

g.  Defendants failed to warn that latching the driver's seat buckle into the latch prior to operating the vehicle allowed drivers of the Ranger like Mr. Schiermeyer to operate the Ranger without wearing a seatbelt and allowed such drivers to operate the Ranger at dangerous speeds above 15 miles per hour;

h.  Defendants failed to warn that the Ranger did not have appropriate safety mechanists or features to prevent users from bypassing or incorrectly using the seatbelt interlock system/device;

i.  Defendants failed to warn that the Ranger did not have appropriate safety mechanisms or features to prevent users of the Ranger from driving the Ranger without a seatbelt;

j.  Defendants failed to warn that the Ranger did not have any warnings (such as auditory sounds or warnings) to notify occupants and the driver of the Ranger that the seatbelt interlock system/device had been bypassed or used incorrectly;

k.  Defendants failed to warn that the soft mesh doors/cab nets would be ineffective to restrain passengers inside the vehicle in the event of a crash and/or rollover, and that there was a strong possibility of ejection from the Ranger should a crash and/or rollover occur even when using the doors/cab nets;

l.  Defendants failed to warn that the plastic quick release buckle would fail in the event of a crash and/or rollover and that the doors/cab nets would fail and cause the occupant to be ejected, resulting in a higher risk of injury and death; and/or

m.  Defendants failed to warn about the Ranger's lack of proper warnings and the precautions to take to prevent or mitigate the dangers of the Ranger.

121.    Defendants knew and/or had reason to know the Ranger was and would be unreasonably dangerous and create an unreasonable risk of injury due to its defects, including the Vehicle Defects, Seatbelt Defects.

122.    Defendants sold and/or distributed for sale the Ranger (including its components) without providing adequate and/or proper warnings and/or instructions to buyers and users of the Ranger about the Vehicle Defects and Seatbelt Defects, including, but not limited to, adequate and/or proper warnings and/or instructions about the dangers of the Ranger's deficient and defective stability, traction, vehicle handling and steering, rollover resistance, occupant restraint system, seatbelts, driver seatbelt interlock device/system, door/cab nets latching mechanism, and door/cab nets system.

123.    Defendants knew and/or should have reasonably foreseen that these warning and/or instruction defects would cause damage and injury to buyers and users of the Ranger (including Mr. Schiermeyer).

124.    The foregoing warning defects made the Ranger defective when it was placed on the market and made the Ranger unreasonably dangerous and unsafe for its intended use when the Ranger (including its components) left the control of Polaris and/or their employees, agents, and/or joint venturers.

125.    At all material times, Mr. Schiermeyer was using the Ranger as intended and/or in a way that Defendants and their employees, agents, and/or joint venturers did anticipate or foresee and/or could have reasonably anticipated or foreseen.

126.    But for Defendants' failure to warn and/or instruct about the dangers of the Ranger, (a) Mr. Schiermeyer would not have started sliding sideways and rolled the Ranger at the time of the incident, resulting in his injuries and death; (b) Mr. Schiermeyer would have been wearing his seatbelt at the time of the crash and would not have been ejected from the Ranger, causing his personal injuries and death; (c) Mr. Schiermeyer would not have been able to operate the Ranger at a speed greater than 15 miles per hour, (d) the sliding, roll, and crash incident involving the Ranger would not have occurred; and (e) Mr. Schiermeyer's ultimate ejection from the Ranger, his damages, injuries, and death would not have occurred.

127.    Defendants' failure to warn and/or instruct about the dangers of the Ranger were a proximate cause of the incident involving Mr. Schiermeyer; the injuries, damages, and death of Mr. Schiermeyer; and Plaintiff's damages and injuries.

**COUNT FOUR:**
**NEGLIGENCE CLAIM**
**AGAINST DEFENDANTS**

128.     Plaintiff hereby reincorporates Paragraphs 1 through 127 of her Complaint as if fully set forth again.

129.     Due to its unreasonably dangerous and defective conditions, as alleged above, the Ranger was not safe for consumers and users, including Mr. Schiermeyer. Defendants knew and/or should have known or reasonably anticipated or foreseen that the Ranger's defective conditions rendered that product unreasonably dangerous and unsafe for its intended use.

130.     Defendants and their employees, agents, and joint venturers had a duty to, but failed to, use reasonable care to design the Ranger (including its stability, traction, vehicle handling and steering, rollover resistance, occupant restraint system, seatbelts, driver seatbelt interlock device/system, door/cab nets latching mechanism, and door/cab nets system) so that it did not have the Vehicle Defects, Seatbelt Defects, or Door Defects and so that it was not in a defective condition or unreasonably dangerous to buyers, users, and others.

131.     Defendants and/or their employees, agents, and/or joint venturers breached this duty by, among other things:

   a.   Designing, engineering, manufacturing, distributing, selling, and marketing the Ranger with the Vehicle Defects, Seatbelt Defects, and Door Defects;

   b.   Failing to properly design, engineer, and manufacture the Ranger so that it had proper and safe lateral stability, vehicle handling and steering, rollover resistance, and a stability and/or traction control system;

   c.   Failing to properly design, engineer, and manufacture the Ranger so that it was not prone to improperly sliding, sliding sideways, and rolling over during, among other things, driving, turns, steering, and navigating curves under the same or similar circumstances that Mr. Schiermeyer was driving at the time of the crash;

   d.   Failing to properly design, engineer, and manufacture the Ranger so that it was not prone to improperly sliding, sliding sideways, and rolling over during turns, steering, and navigating curves at speeds above 15 miles per hour;

   e.   Failing to properly design, engineer, and manufacture the Ranger so that it had proper and safe lateral stability;

   f.   Failing to properly design, engineer, and manufacture the Ranger so that it had an appropriate stability and/or traction control system to, among other things, prevent and/or mitigate the Ranger from sliding sideways or rolling;

g.  Failing to properly design, engineer, and manufacture the Ranger with a safe and proper seatbelt interlock system/device;

h.  Failing to properly design, engineer, and manufacture the Ranger such that it could not be operated without occupants of the Ranger wearing a seatbelt;

i.  Allowing drivers to operate the Ranger at dangerous speeds above 15 mph without wearing a seatbelt;

j.  Failing to properly design, engineer, and manufacture the Ranger such that it had appropriate safety mechanists or features to prevent users from bypassing or incorrectly using the seatbelt interlock system/device;

k.  Failing to properly design, engineer, and manufacture the Ranger with a safe and proper door/cab nets latching mechanism and doors/cab nets that would be able to restrain passengers in the event of a rollover crash;

l.  Failing to properly evaluate and test the Ranger, including, but not limited to, its dynamic driving performance and its performance during steering, turning, or navigating curves to determine, among other things, under which circumstances, speeds, and steering angles the Ranger could or would slide, slide sideways, tip, or rollover;

m.  Failing to properly and safely design, engineer, manufacture, distribute, supply, sell, and/or deliver the Ranger (including its components);

n.  Failing to warn of the dangers of the Ranger, including, but not limited to, the dangers identified above in Plaintiff's Complaint (including those dangers identified in Count 3 of Plaintiff's Complaint);

o.  Failing to provide adequate and/or proper warnings and/or instructions about the Ranger, including, but not limited to, the warnings that Defendants failed to give as identified under Count 3 of Plaintiff's Complaint;

p.  Designing, engineering, manufacturing, distributing, supplying, and/or delivering the Ranger (including its components) in such a way as to endanger the safety and wellbeing of buyers, users, and others, including, but not limited to, Mr. Schiermeyer; and/or

q.  Failing to otherwise use reasonable care to ensure the Ranger (including its components) were appropriate, safe, and not dangerous.

132.     The foregoing breaches and the negligence of Defendants and/or their employees, agents, and/or joint venturers were a proximate cause of the incident involving Mr. Schiermeyer; the injuries, damages, and death of Mr. Schiermeyer; and Plaintiff's damages and injuries.

133.     Defendants, and each of them, are vicariously liable for the negligence of their employees, agents, and/or joint venturers, including, but not limited to, under the doctrine of *respondeat superior*, all theories of agency, and/or all theories of joint venture.

134.     Defendants, and each of them, are vicariously liable for each other's negligence (as well as the negligence of each other's employees, agents, and/or joint venturers), including, but not limited to, under the doctrine of *respondeat superior*, all theories of agency, and/or all theories of joint venture.

<u>**SECOND CAUSE OF ACTION:**</u>
<u>**SURVIVAL CLAIM**</u>

135.     Plaintiff hereby reincorporates Paragraphs 1 through 134 of her Complaint as if fully set forth again.

136.     Plaintiff's second cause of action against Defendants is a survival claim against Defendants.

137.     Mr. Schiermeyer passed away on or about September 15, 2023. He was 57 years old at the time of his death.

138.     Mr. Schiermeyer incurred medical, hospital, and/or other expenses; injuries; and damages, including, but not limited to, severe mental and physical pain, suffering, anguish, and emotional distress, before he died.

139.     With regard to Plaintiff's survival claim against Defendants, Plaintiff hereby asserts and incorporates herein the above four counts/claims/legal theories against Defendants.

140.     The damages Plaintiff seeks against Defendants on her survival claim are identified in Paragraphs 142(a) through (c) and 143 of her Complaint and are incorporated herein by this reference.

<u>**DAMAGES COMMON TO ALL CAUSES OF ACTION**</u>
<u>**AND COUNTS IN PLAINTIFF'S COMPLAINT**</u>

141.     Plaintiff hereby reincorporates Paragraphs 1 through 140 of her Complaint as if fully set forth again.

142.     As a direct and proximate result of the actions and/or inactions and/or negligence of Defendants and/or their agents, employees, and/or joint venturers (and each of them):

(a)     Ms. Schiermeyer and Mr. Schiermeyer's next-of-kin have suffered and will continue to suffer all wrongful death damages provided under the law, including, but not limited to, emotional distress, loss of financial support, and the loss of Mr. Schiermeyer's society, comfort, companionship, services, support, earnings, consortium, counsel, guidance, care, love, affection, attention, protection, aid, and assistance;

(b)     Ms. Schiermeyer, Mr. Schiermeyer, and/or Mr. Schiermeyer's next-of kin have incurred and/or will incur healthcare, medical, hospital, funeral, and burial expenses and services, as well as the past and future loss of Mr. Schiermeyer's earnings, earning capacity, and wages;

(c)     Mr. Schiermeyer received injuries and experienced physical and mental pain, suffering, anguish, emotional distress, disability, disfigurement, and embarrassment; passed away, and lost the enjoyment of the rest of his life;

(d)     Ms. Schiermeyer also experienced emotional trauma and damages as a result of being by her husband's deathbed and communicating with medical personnel about efforts to save his life.

143.     The amount of damages that Plaintiff, Mr. Schiermeyer, and Mr. Schiermeyer's next-of-kin have sustained exceeds the sum of $1,000,000, exclusive of interest and costs.

144.     Plaintiff reserves the right to amend and/or supplement her Complaint as the litigation and discovery proceed in this lawsuit.

WHEREFORE, Plaintiff prays for Judgment against Defendants on her First and Second Causes of Action for the general and special damages that (a) Plaintiff, (b) Matthew T. Schiermeyer, and (c) and the next-of-kin of Matthew T. Schiermeyer have sustained and/or will sustain; prejudgment and post-judgment interest thereon at the highest legal rate; the costs of this lawsuit; attorney fees; and such further relief as the Court deems just and equitable.

## DEMAND/REQUEST FOR JURY TRIAL

Plaintiff prays for and requests a trial by jury on all matters raised herein in the above-captioned lawsuit.

DATED this 25th day of August, 2025.

JENNIFER SCHIERMEYER, Individually, and as
Special Administrator of the ESTATE OF
MATTHEW T. SCHIERMEYER, Deceased,
Plaintiff

By:    /s/ Michael F. Coyle
Michael F. Coyle, #18299
Heidi V. Mickelson, #28223
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102
(402) 341-6000 (telephone)
mcoyle@fraserstryker.com
hmickelson@fraserstryker.com
ATTORNEYS FOR PLAINTIFF